### HINTON v. SAUL, ET AL.*
(No. 1318; Sept. 6, 1927; 259 Pac. 185)

CONTINUANCE — ABSENT WITNESS — FRAUDULENT CONVEYANCES — FINDINGS OF TRIAL COURT—RES GESTAE—APPEAL AND ERROR— TRIAL.

1. Denial of motion for continuance on the ground of illness and absence of material witness, unsupported by showing of diligent effort to secure deposition of witness who resided out of the state, held not an abuse of discretion.

2. In an action to set aside transfer of property made to the wife of an insolvent, on grounds of fraud, and subject the property to payment of husband's debts, declarations made by the husband in paying for cattle purchased in the name of his wife, held admissable as part of the *res gestae.*

3. In an action to vacate transfers of property made to wife of insolvent, on grounds of fraud, a finding that cattle claimed by the wife had been purchased in part with her husband's money held, supported by evidence.

4. Where an insolvent husband borrowed money with which he purchased property in the name of his wife, without consideration, the transaction is voidable as to creditors, irrespective of his intent.

5. A general exception taken to a judgment on the ground that the findings do not support the judgment, is sufficient without special exceptions to the findings.

6. Findings of fact by the court must be liberally construed, and if admitting of construction that will support the judgment, that construction should be adopted rather than one that would render the judgment erroneous.

7. In causes tried to a court, a general finding is one that covers every thing necessary to be found to sustain the judgment.

8. In an action to set aside transfers of property made to the wife of an insolvent, on grounds of fraud, evidence held sufficient to support a finding that certain bank stock was purchased with husband's money and that proceeds therefrom should be first applied on plaintiff's judgment, also that a part of the purchase price of other property was paid from husband's money, and that the proceeds from said property not exceeding the sum contributed from husband's funds, and only so much thereof as is necessary, should be applied to fully satisfy plaintiffs' judgment.

9. Where an insolvent debtor uses money loaned to him to buy property and puts the property in the name of his wife without any consideration, the transaction is voidable as to creditors whether or not he had a fraudulent intent, since purity of intent is not involved in such a case.

10. In an action to set aside alleged fraudulent conveyances of property to an insolvent debtor's wife on the ground that property was purchased with money belonging to the debtor, burden of establishing that debtor owned money was an plaintiffs.

11. In an action to set aside an alleged fraudulent conveyance of cattle to an insolvet debtor's wife on the ground that purchase price of the cattle was paid for with money belonging to the debtor, evidence *held* not to show that the debtor owned certain money claimed to have been used to purchase the cattle.

12. In an action to set aside alleged fraudulent conveyances of property to an insolvent debtor's wife on the ground that property was purchased with money belonging to the debtor, burden of establishing that debtor owned money was on plaintiffs.

13. In an action to set aside an alleged fraudulent conveyance of cattle to an insolvent debtor's wife on the ground that purchase price of the cattle was paid for with money belonging to the debtor, evidence *held* not to show that the debtor owned certain money claimed to have been used to purchase the cattle.

14. Whether findings were sufficient to support the judgment *held* properly before the Supreme Court for review, though no exception was taken to the findings, where a general exception was taken to the judgment and the insufficiency of the findings to support the judgment was specifically urged in the motion for a new trial.

15. In an action to set aside an alleged fraudulent conveyance of property to an insolvent debtor's wife on ground that property was purchased with money belonging to the debtor, plaintiffs should, in no event, have a claim against the property for a greater amount than the amount of money that debtor put into it.

16. Findings of fact by the court must be construed liberally, and, if they admit of a construction that would support the judgment, that construction must be adopted rather than one which would render the judgment erroneous.

17. In causes tried to court, a general finding is a finding of every special thing which it is necessary to find in order to sustain judgment.

18. In a cause tried to the court, finding that sheep, cattle, and bank stock conveyed to an insolvent debtor's wife were purchased in part with funds belonging to the debtor, and that all of the property was subject to a judgment against him, must be construed to mean that a sufficient amount of the property involved was purchased with the money of the debtor to require a full satisfaction of the judgment; since finding must be construed liberally and favorably to judgment and general finding in cause tried to court is finding of every special thing necessary to sustain judgment.

19. In an action to set aside fraudulent conveyances, a court of equity has power to adapt its relief to the exigencies of the case and at times may even render personal judgment against the party who received the property.

20. In an action to set aside an alleged fraudulent conveyance of bank stock, cattle, and sheep to insolvent debtor's wife, without consideration, where it appeared that all of the bank stock and part of the live stock were purchased by the debtor with his own money, *held*, that both bank stock and live stock were subject to debt, and that the bank stock should be first applied thereto and thereafter the live stock to the amount of money that the debtor had put into the live stock.

*See Headnotes: (1) 13 C. J. p. 151 n. 67; p. 163 n. 27, 28; (2) 22 C. J. p. 364 n. 71; (3) 22 C. J. p. 364 n. 68; (4, 5) 27 C. J. p. 792 n. 61; p. 828 n. 12; (6) 27 C. J. p. 831 n. 20; (7, 8) 27 C. J. p. 831 n. 20; 27 C. J. p. 470 n. 7; p. 506 n. 91; (9-11) 27 C. J. p. 503 n. 68; p. 831; n. 20, 27 New; (12, 13) 27 C. J. p. 795 n. 91 New; p. 831 n. 20; (14) 3 C. J. p. 935 n. 91; (15-17) 27 C. J. p. 667 n. 45 New; 38 Cyc. p. 1966 n. 86; p. 1977 n. 37; (18-20) 27 C. J. p. 847 n. 9 New; p. 849 n. 42 New; p. 835 n. 29.

ERROR to the District Court, Converse County; CYRUS O. BROWN, Judge.

Action by W. A. Saul anl another against W. S. Hinton and Iona B. Hinton to set aside conveyances of property made to Iona B. Hinton, wife of W. S. Hinton, and subject that property to the payment of a judgment. From, a judgment and decree for plaintiffs, the defendants bring error.

*Hagens & Murane,* for plaintiffs in error.

The court erred in refusing a continuance on account of the absence of a material witness who was ill, 9 Cyc. 105. The cases of Kearney Stone Works v. McPherson, 5 Wyo. 178, Keffer v. State, 12 Wyo. 49, Baldwin v. McDonald, 24 Wyo. 121, Chapman v. Bank, 26 Wyo. 144 are distinguishable upon the facts. J. P. Hinton, the witness in question, had agreed to be present, which was the reason why his deposition had not been taken. The decree exceeded plaintiffs' claim; plaintiffs claimed that the bank stock, cattle and sheep only belonged to W. S. Hinton but the court found the real estate, horses and farm equip-

ment belonged to W. S. Hinton and all of said property was decreed subject to a judgment of plaintiffs. The evidence shows that at the time the wife acquired their property and obligated herself for its payment, her husband was insolvent. She had a right to acquire property free from her husband's debts, and to carry on a business of her own, 4974, 4975 and 4978 Comp. Stats. Arndt v. Harshaw (Wis.) 10 N. W. 390; Hedge v. Glenny (Ia.) 39 N. W. 818; Stratton v. Bailey (Me.) 14 Atl. 729; Rice v. Allen (Nebr.) 95 N. W. 704; Guthrie v. Hill (Ky.) 127 S. W. 767; Cogar v. Bank, (Ky.) 152 S. W. 278; Koopman v. Mansolf (Mont.) 149 Pac. 491; Crump v. Walkup (Mo.) 151 S. W. 709. One alleging fraud must prove the fraud he alleges in a clear and satisfactory manner, Kahn v. Ins. Co., 4 Wyo. 419. The law does not allow imputations of fraud when the facts and circumstances out of which it is supposed to arise are consistent with honesty and purity of intention. Patterson v. Lee-Clark-Andreesen Co., 7 Wyo. 401. The trial court based its decision upon language from 27 C. J. 410, to the effect that if the consideration for the transfer to the wife comes from the husband, wholly or in part, the property may be reached by his creditors. The principle applies to a joint purchase by husband and wife as shown by the cases cited in the text, but the principle is not applicable here. Dickinson v. Patton, 65 S. E. 529; New South Bldg. Assn. v. Reed, 31 S. E. 514. The court erred in subjecting all personal property of Mrs. Hinton, except forty head of cattle, to the payment of her husband's debts. Plaintiffs failed to sustain their burden of proof. The decree of the trial court is not sustained by the evidence. The court was without power or jurisdiction to decree the sale of the property belonging to the wife, without reference to the amount of money, if any, contributed by her husband.

*M. A. Kline* and *Maurer & Walker*, for defendants in error.

The denial of plaintiffs' motion for continuance was not reversible error. Keffer v. State, 12 Wyo. 49; Chapman v. Bank, 26 Wyo. 144; Campbell v. Blanke, 13 Kan. 62; 13 C. J. 165; Assn. v. Co., 134 Pac. 443; McNett v. McNett (Cal.) 187 Pac. 448; Ward v. Atkinson (Colo.) 123 Pac. 120. The evidence sustains the amended decree, Staley Co. v. Beckstead, 27 Wyo. 173; Worland v. Davis, 31 Wyo. 108; Sewell v. McGovern, 29 Wyo. 62. There was no evidence that Mrs. Hinton had an account in the First National Bank of Douglas, and none of the checks called for were produced, either on the Douglas Bank or Hannibal, Missouri Bank. The liberal provisions of our statutes as to property rights of married women have no application here and the cases cited by plaintiffs in error are inapplicable upon the facts in the case at bar. In this case the wife did nothing, knew nothing about the business and left everything to the control and management of her husband. He received a legacy from his grandmother's estate, some of which was used in the purchase of the bank stock. The general effect of the evidence was that W. S. Hinton owned all of the porperty. An insolvent debtor cannot use his wife's name as a mere device to defeat creditors. Blum v. Ross (Pa.) 10 Atl. 32; Lachman v. Martin (Ill.) 28 N. E. 795; Wedgewood v. Withers (Nebr.) 53 N. W. 576; Hamill v. Augustine (Ia.) 46 N. W. 1113; Bank v. Marshall (Ky.) 35 S. W. 912; Nickle v. Co. (Ark.) 13 S. W. 78. The error alleged, that the findings did not support the judgment, is not before this court since there was no exception taken to the findings—the only exception taken was a general exception to the judgment, which raises no question as to findings, 3 C. J. 937; Midland Co. v. Dickason (Ind.) 29 N. E. 775; Buckeye Co. v. Fee, 57 N. E. 446; 3 C. J. 933. The trial court, however, found generally for the plaintiffs and against the

defendants and also found that the equities of the case are with the plaintiffs. The district court had power to amend its judgment, Chennoweth v. R. R. Co. (Mont.) 148 Pac. 330; Washington Coal v. Murray (Colo.) 100 Pac. 588. Defendants had property of the value of at least $75,000, from which plaintiffs' judgment should be paid, irrespective of legal questions involved. The judgment of the trial court should be sustained.

BLUME, Chief Justice.

This is an action brought by W. A. Saul and H. C. Saul, as plaintiffs, against W. S. Hinton and Iona B. Hinton, as defendants, to set aside certain conveyances of bank-stock and of cattle and sheep to Iona B. Hinton, wife of W. S. Hinton, and to subject that property to the payment of a judgment which plaintiffs then had against W. S. Hinton, and which was based on an indebtedness that arose prior to the summer of 1921. From a judgment and decree for plaintiffs, the defendants have appealed. The parties will herein be referred to as in the case below.

1. The cause came regularly on for trial in the District Court on February 23, 1925. On that day, but before the trial was commenced, the defendants filed a motion for continuance of the case, alleging that J. P. Hinton, father of W. S. Hinton, was a material witness; that he had been expected to be present at the trial, but that, according to a telegram received from a physician on February 20, 1925, he was sick and unable to travel. The trial court overruled the motion for continuance, and this ruling is assigned as error herein. The action was commenced on March 29, 1924; the answer was filed May 3, 1924, and the reply thereto on May 12, 1924. On November 8, 1924, the case was continued to January 5, 1925, and by a later order the case was again continued to February 23, 1925. No attempt apparently was made to obtain the deposition of the witness up to the time of the trial. The plaintiffs

in the case took depositions of witnesses at Hannibal, Missouri, the residence of J. P. Hinton, in the month of November, 1924, and during that time sought to obtain also the deposition of J. P. Hinton, and caused a subpoena to be served on him to appear and give his testimony, but the subpoena was ignored by the witness and he left Hannibal, Missouri, on the date when he was asked to appear. Further, the telegram of the physician stating that the witness was unable to travel was not supported by any affidavit on the part of anyone having knowledge of such sickness. The telegram was sent on February 20, 1925, and it is not unlikely that such affidavit might have reached Douglas before the commencement of the trial. On the whole, we are unable to say that the court abused its discretion in refusing to adjourn the trial of the case, and we think that the assignment of error in reference thereto must be overruled, in accordance with Keefer v. State, 12 Wyo. 49, 73 Pac. 556; Chapman v. Bank, 26, Wyo. 138, 181 Pac. 360; Lampitt v. State, 34 Wyo. 247, 271; 242 Pac. 812.

2. It is assigned as error that the judgment of the trial court is not sustained by sufficient evidence. This will require a review of the testimony in the case, though that must necessarily be brief. We shall mention only what we consider the salient facts, and without particularly discussing some transactions, like the purchase of ranch property and loans in connection therewith, which have only an incidental bearing herein. On many points, the testimony is indefinite and unsatisfactory, making it difficult to arrive at a conclusion. It seems that W. S. Hinton and one Garst were in partnership in the cattle business and that they became insolvent about the month of September, 1921. From that time on W. S. Hinton apparently did most or all of the business transacted by him in the name of his wife, Iona B. Hinton, and, as claimed by them, as her agent, receiving a power of at-

torney from her in the spring of 1922, which authorized
him to transact all business for her.  At the time that
Hinton & Garst became insolvent, Iona B. Hinton had no
property of her own, except a few cows and calves given
her by the partnership mentioned for services performed
for it.  It seems to be admitted that most of the property,
consisting of cattle and sheep and bank-stock, which was
acquired in her name was acquired by means, or as the
result, of certain loans which will be mentioned hereafter.
After the failure of Hinton & Garst, there was no visible
change in the business-actions of W. S. Hinton, except
that all, or substantially all, of the property purchased by
him was purchased in the name of Iona B. Hinton.  We
think that the trial court was justified in finding, judging
from the testimony which Mrs. Hinton gave in the trial
of the case, that she knew very little of the business which
was transacted in her name; that she attended to very
little of it herself, but that W. S. Hinton attended to prac-
tically all of it.

The foregoing general facts are of moment only, of
course, if at all, in connection with the facts which will
be detailed directly.  And it would seem that some of the
transactions that appear in the evidence stand out distinct.
from the others and may well be considered separately.

(a)   On October 16, 1922, W. S. Hinton bought from
Luther Freeman 101 calves and 37 steers for the sum of
$4270, the bill of sale for them being taken in the name of
Iona B. Hinton.  Freeman testified that his dealings were
exclusively with W. S. Hinton, who gave him his personal
check on the First National Bank of Douglas; that when
he, Freeman, inspected the check, Hinton remarked: "That
is all right, you can get it cashed here, but just don't say
anything about it."  Counsel for appellant claim that this.
statement was hearsay and not binding on Iona B. Hinton.
No authorities to that effect have been cited, and we doubt.
that any can be found.  The statement was made at the
time and as part of the purchase of the property.  It is held.

that declarations of a person who stands in some relation of privity to a party are admissible as part of the *res gestae* for the purpose of showing a conveyance to be fraudulent. 22 C. J. 364. The situation is slightly different here. The plaintiffs claim that the property in question was bought with money belonging to W. S. Hinton. The defendants claim that W. S. Hinton was the agent of his wife. Whether the actual situation was the one or the other was one of the very issues in the case and we cannot assume the agency mentioned as counsel for defendants apparently would have us do, and from that, as a basis, conclude that the statement was not binding because authority to make it was not shown. We are unable to see how the statements of W. S. Hinton could, under the circumstances, be held any less a part of the *res gestae* than under the state of facts mentioned in 22 C. J. 364. See also In re Thompson, 197 Fed. 681. Again, it is claimed that the check, though given by W. S. Hinton, might have been paid out of the account of Iona B. Hinton, and that the plaintiffs should have shown the contrary. We cannot agree with counsel. We must assume that the check was paid as checks usually are—out of the account of W. S. Hinton. If the usual course was not followed, the burden was on the defendants to show that fact. The defendants did not attempt to explain the transaction, but denied that W. S. Hinton gave his personal check, and claimed that it was signed in the name of Iona B. Hinton, by W. S. Hinton. A demand was made on the defendants to produce this check, but this was not done, and it was claimed that it was lost or misplaced. Many other checks also which were asked to be produced by the defendants were not produced, but were claimed to be lost, while various bills of sale taken in her name were on hand. The defendants were further asked to produce the papers which they had in connection with the bank account in the First National Bank of Douglas, but this, too, was not done. In fact, while it may be true that an account in the name of Iona B. Hinton was kept in this bank, not a trace of it

could be found by the receiver of the bank. It was shown that W. S. Hinton was an officer of that bank from the spring of 1922 to and including the spring of 1923, and during that time drew a salary of $200 per month. He kept an account in the bank, and at one time drew a check against it for about $1800, the interest on some of the loans hereinafter mentioned, though he explained that by stating that he did so by mistake. We think that on the whole, no matter what our opinion of the transaction in question might be, we would not be warranted in holding that there was no substantial evidence for the trial court to find that the cattle bought from Freeman were bought with money belonging to W. S. Hinton. If that is not in fact true, the blame for a contrary finding must be sought in the unusual manner in which defendants transacted their business or permitted it to be transacted.

(b)   In the spring of 1922, W. S. Hinton commenced to negotiate for the purchase of 170 shares of the capital stock of the First National Bank of Douglas, for the sum of $37,400. The purchase thereof was completed, and all but ten shares thereof were taken in the name of Iona B. Hinton. The testimony for the plaintiffs showed that in the preliminary negotiations for the purchase of this stock no mention was made of Mrs. Hinton, and that at about the time the stock was actually taken over, W. S. Hinton stated that he was putting the stock in his wife's name on account of judgments against himself. It further appears from the testimony that the stock was paid for by two checks on the Hannibal National Bank of Hannibal, Missouri, of which J. P. Hinton was cashier; that these checks were drawn by W. S. Hinton personally and were as follows: one for $10,000, dated May 11, 1922, paid May 20, 1922, and one for $27,400, paid June 19, 1922. Only the first check is of importance at present. It appears that a deposit was made in the account in the Hannibal National Bank, on which W. S. Hinton had a right to draw, of $12,750, on May 17, 1922—only one day

after the check for $10,000 was given and only three days before it was paid, and no other amount so far as the record shows appears to have been deposited to such account between the two dates. It would seem, judging from the testimony of W. S. Hinton, that this amount of $12,750 was an inheritance left to him by his grandmother. The point is not altogether clear, and Hinton seems to indicate by his testimony that his wife had an interest in this money. Counsel for defendants, however, do not seem to dispute the contention of counsel for plaintiffs that this money belonged to W. S. Hinton. The defendants contended on the trial and testified that instead of the check of $10,000 above mentioned being drawn against this deposit, the $12,750 was paid to J. P. Hinton on some past indebtedness and that the latter in turn made a loan to Iona B. Hinton for $10,000 to make good the first payment on the bank-stock, paid, as above mentioned, on May 20, 1922. A demand was made on the defendants to produce the checks given in payment of the bank-stock, but this was not done, the defendants claiming that they were probably lost. In view of this, as well as other testimony mentioned hereafter, we think that we would not be warranted in holding that there was no substantial evidence to permit the trial court to find that the $12,750 was deposited to the account of W. S. Hinton; that the money belonged to him, inherited from his grandmother, and that the check for $10,000 given in part-payment of the bank-stock was paid out of this deposit. What was done with the balance, namely $2750, is not clear. There does not seem to be any evidence, or at least any substantial evidence to contradict the testimony of the defendants that it was paid over to J. P. Hinton. While W. S. Hinton testified that the proceeds of loans were largely used to purchase the bank-stock and the cattle and sheep, the money mentioned was not a loan, and we are unable to find that it has been traced into the property herein

sought to be held.  We cannot, on account of the peculiar
and indefinite finding of the trial court, tell what its view
was on this point, though we think that it probably was
in accord herewith.  The second payment on the bank-
stock will again be referred to later.

(c)  The remaining transactions cannot be easily sepa-
rated and will be treated as a whole.  As heretofore stat-
ed, it seems to be agreed that most of the property ac-
quired in the name of Mrs. Hinton, consisting of cattle,
sheep and bank-stock, had its foundation in and was main-
ly the result of certain loans from the Farmers and Mer-
chants Bank of Hannibal, Missouri.  One loan was made
on December 19, 1921, evidenced by two promissory
notes, one for $6,000 and one for $9,000.  A further loan
was made on February 27, 1922 of $1,000, and another
loan of $28,000 on June 19, 1922.  The last loan was used
to pay the balance of the bank stock; the proceeds of the
other loans were used mainly or entirely in the purchase
of cattle and sheep.  The notes given for each of these
loans were signed by Iona B. Hinton, W. S. Hinton and
J. P. Hinton, in the order named, all signing as principals
so far as the notes indicate.  Now W. S. Hinton became
insolvent, as already shown, in the summer of 1921, and
he was insolvent at the time when the loans above men-
tioned were made.  It is probably true, also, that the loans
from the Farmers and Merchants Bank were made mainly
on the credit of J. P. Hinton.  And it is argued that it
would have been folly for J. P. Hinton to have lent his
name and his credit for the purpose of having his son,
W. S. Hinton, buy property which, in view of the debts
outstanding against him, was apt to be immediately sub-
ject to seizure; that, accordingly, the natural thing for
him to do was to have Mrs. Hinton borrow the money and
buy the property.  We can find no fault with the logic of
the argument.  J. P. Hinton had a perfect right to refuse
to lend his name and his credit to W. S. Hinton.  And he

had an absolute right to help him indirectly by lending his credit to Iona B. Hinton. Such acts on his part would not have been tainted by the slightest fraud, and the creditors of W. S. Hinton would have no right to claim that they were prejudiced thereby, for J. P. Hinton was under no obligation to them. There can be no fraudulent conveyance, unless actual fraud results (27 C. J. 469), and none could result from such acts. It may also be conceded that the fact that Mrs. Hinton was the first to sign the notes in question and the fact that the property was taken in her name, is some evidence to indicate that J. P. Hinton lent, and intended to lend, his credit to her. Nor are we prepared to hold that the former's statement, made in the bank in Douglas in the spring of 1923, to the effect: "What else could he—W. S. Hinton—do but put the property in his wife's name in face of all these judgments," is at all inconsistent therewith. It may be granted that it would not have been wisdom for J. P. Hinton to lend his credit, under the circumstances, to his son. We may concede all this and still must remember that many things are done inadvisedly, and results frequently disappoint expectations. So the question still remains: Did the money that was loaned become the property of W. S. Hinton or did it not?—or rather: Was the trial court justified by the evidence in finding that W. S. Hinton became such owner? If he became such owner, if the money was actually lent to him, he had no right, in view of his insolvency, to use it by putting the property bought with it in the name of his wife without any consideration, whether he had an intent to defraud his creditors or not, for in such event an intent to defraud was not necessary in order to make the transaction voidable as to creditors. "Purity of intent" is not involved in such a case. 27 C. J. 500; 27 C. J. 503; Lachman v. Martin, 139 Ill. 450; 28 N. E. 795; Blum v. Ross, 116 Pa. 163; 10 Atl. 32; Hamil v. Augustine, 81 Iowa 302, 46 N. W. 113; Seitz v. Mitchel,

94 U. S. 580. Nor do we see how the fact that liberal pro-
visions for the benefit of women are made by the laws of
Wyoming, has any bearing herein. And we cannot agree
with counsel for defendants that the evidence "clearly"
shows that the money was loaned to Iona B. Hinton. They
would have us give absolute credence to the testimony of
W. S. Hinton and reject all the testimony for plaintiffs.
Mr. Hodgdon, cashier of the Farmers and Merchants Bank
at Hannibal, Missouri, testified that the loans above men-
tioned were negotiated through J. P. Hinton; that the lat-
ter came to him to borrow the money for W. S. Hinton,
the name of Iona B. Hinton not being mentioned at all,
though she signed the notes, and that the loans were made
to W. S. Hinton. In a conversation with this witness, J.
P. Hinton said in substance: "He (W. S. Hinton) didn't
lose any more than he put in; * * * it will be Wil-
liam's loss; what I have to pay for William will be
charged up against his share of my estate." This last
conversation related, however, only to the bank-stock and
to the loan made for the purchase thereof, and it may be
doubtful, since it was casual and did not, apparently, take
place at the time when any of the loans were made, that
it was competent testimony. And inasmuch as neither of
the defendants were present at the time of the making of
the loans, the other testimony of Mr. Hodgdon would,
perhaps, not be of great value, were it not for the corro-
borative fact that will now be mentioned. The proceeds
of the $1,000 loan in February was apparently deposited
in the Hannibal National Bank, and it is certain that the
$28,000, borrowed in June, 1922, was so deposited, and it
becomes, accordingly, important to determine the owner-
ship of the account into which this money was put. The
defendants took the depositions of Mr. Ihring, assistant
cashier of the Hannibal National Bank in November, 1924.
The witness produced the ledger sheets showing the fore-
going account, consisting of six sheets, the account run-

ning from about the month of March, 1921, to the latter part of the year 1923. Five of these sheets were kept in the name of "W. S. Hinton or Iona B. Hinton." The witness Walker testified in substance and effect that only W. S. Hinton's name appeared on one of the sheets, and that the other five sheets showed unmistakably that they originally contained only the name of W. S. Hinton and that the name of Iona B. Hinton was added subsequently, leaving the inference that this was done with the present suit in view. If the trial court believed this testimony, which we must assume, how can we reverse a finding that the money in the foregoing account was the money of W. S. Hinton? It would seem that we could do so only on the theory that the court had no right to credit that testimony; and we fail to see how we can so hold. The proceeds of the $28,000 loan—or substantially all—were used to buy bank-stock, and the proceeds of the other loans were used, according to the testimony of defendants, to buy cattle and sheep, and we would, accordingly, not be justified in reversing a finding that all of the bank-stock was purchased with money of W. S. Hinton, and that the $1,000 loan of February, 1922, was used for the purpose of buying cattle or sheep, purchased in the name of Mrs. Hinton.

What became of the loans of $6,000 and $9,000 is not very clear. It appears that at least some of the money, about $5,000, was sent directly to the Douglas National Bank, and Mrs. Hinton drew a check against it to pay for cattle bought from Bolln & Rice. There is some testimony given by Mrs. Hinton which would seem to indicate that the proceeds of the loans now under consideration were deposited in the Hannibal National Bank; but she did not pretend to know much about the matter, her testimony is indefinite, of little weight one way or the other, and in view of the deposit in the Douglas National Bank above mentioned, could be true at best only partially. In any

event, the burden of proof to establish the ownership of the money in W. S. Hinton was on the plaintiffs. They had access to the ledger sheets of the account heretofore mentioned, and could easily have shown that the amounts of the foregoing loans were deposited in the Hannibal National Bank, if that in fact was true. But nothing of that kind appears in the depositions before us, and we must conclude that the ownership of this money in W. S. Hinton has not been sufficiently established, and if the trial court found the contrary, which is not at all certain, the judgment must be modified in that respect. An extra $1,000 was apparently deposited in the Hannibal National Bank, according to Mr. Ihring's testimony, in February, 1922, but the origin of that amount is not shown; nor does it sufficiently appear how it was used, and the testimony as to that money is too uncertain and unsatisfactory, so as to warrant any conclusion that it was used in the purchase of cattle or sheep in the name of Mrs. Hinton.

3. The court in its amended judgment in the case, of date March 25, 1925, found the existence of a judgment in favor of the plaintiffs against W. S. Hinton, and after finding "generally for the plaintiffs and against the defendants and that the equities of the case are with the plaintiffs," specially found:

"That all sheep, cattle, and shares of capital stock of the First National Bank of Douglas, Wyoming, now standing in the name of the defendant Iona B. Hinton, with the exception of 20 head of cattle owned by the said Iona B. Hinton in her own right at the time Hinton & Garst failed, to-wit September, 1921, and the increase thereof not exceeding forty head, were purchased *in part* with funds belonging to the defendant W. S. Hinton, and are subject to the judgment in favor of plaintiffs as hereinbefore mentioned."

The court then adjudged all of said property, with the exception mentioned, to be subject to said judgment so far as necessary to satisfy the same. No point is made of the indefiniteness of the exception made in the finding, but the defendants claim that the court could not, after finding that the property mentioned was bought with money of W. S. Hinton only in part, adjudge all of it to be subject to the indebtedness due to plaintiffs. The gist of the objection is that the judgment is not supported by the findings. Counsel for the plaintiffs claim that this point cannot be reviewed by this court for the reason that no exception was taken to the findings. A general exception was taken to the judgment, and the point now urged was specifically urged in the motion for a new trial. We held in the case of Nichols v. Board of Commissioners, 13 Wyo. 1, 76 Pac. 681, 3 Ann. Cas. 543, that a final judgment in a cause may be reversed on error upon the ground that it is not supported by the findings, even though no objection is taken to the judgment. The case sets out a ruling in Michigan to the effect that "when the only error alleged is that the finding of facts does not support the judgment rendered, no exceptions are necessary as the finding itself becomes a part of the record, which thus presents the question as fully as it could be presented by exceptions." We think, accordingly, that the point urged by counsel for the defendants is properly before us for review.

It does not, of course, necessarily follow that simply because part of Mrs. Hinton's property was bought with money belonging to W. S. Hinton, her property should be subjected to the satisfaction of the whole of plaintiffs' judgment, and the cases cited in 27 C. J. 645, would not sustain any such rule. Plaintiffs should in no event have any claim against it greater in amount than the money of W. S. Hinton put into it. Findings of fact by the court, however, must be construed liberally, and, if possible, in

support of the judgment. Marysville Dev. Co. v. Hargis, 41 Idaho 257, 239 Pac. 522. If findings admit of a construction that will support the judgment, that construction will be adopted rather than a different one that would render the judgment erroneous. Bishop v. Hawley, 33 Wyo. 271, 238 Pac. 284. And in causes tried to a court, a general finding is one of every special thing necessary to be found to sustain the judgment. Argo v. Pasquali, 109 Okla. 269, 235 Pac. 602; Barnett v. Hentger, 109 Okla. 91, 238 Pac. 188; Brockman v. Roberts, 87 Okla. 57, 213 Pac. 545; Mutual Life Ins. Co. v. Boucher, 83 Okla. 42, 200 Pac. 584. In view of these rules of law, we must assume in the case at bar—and which is not unreasonable —that the court found that at least a sufficient amount of the property in question was bought with the money of W. S. Hinton so as to require the full satisfaction of the judgment against the latter, which, as of date April 16, 1923, amounted to $11,010.87. If the finding, so construed, is supported by sufficient evidence, it cannot be disturbed; if not, the judgment can readily be modified in so far as the finding is sustained, and must, if necessary, be modified to that extent. We see no particular objection in not singling out certain property which should be subjected to the judgment. The testimony shows that the live stock bought in the name of Iona B. Hinton did not remain in the same situation; some of it was sold, and other stock was bought in lieu thereof. It is said in 27 C. J. 855, that a court of equity has the power to adapt its relief to the exigencies of the case, at times even rendering personal judgment against the party who received the property in a case like that at bar. So we cannot see that it would be unjust or improper to subject to the satisfaction of the judgment all of the property in the name of Mrs. Hinton, in so far as warranted by the testimony. One exception must be made. The sum of $37,400, was definitely traced, and was used for the purchase of the stock in the First

National Bank. This transaction is readily separable from the others, and it would, we think, be wholly unjust not to separate it, but, on the contrary, to make the money used for that purpose a lien also on the live stock. The decree herein did not make a separation of these transactions, and it, accordingly, must be modified in that respect.

As heretofore stated, there is, we think, sufficient evidence in the record to sustain a finding that all of the bank stock was bought with money belonging to W. S. Hinton. The bank in which that stock was bought has become insolvent, but some amount, as indicated by the record, will be paid to the stockholders. That amount should first be applied on the judgment. If that is not sufficient to satisfy the judgment, then resort may be had against the cattle and sheep of Iona B. Hinton, as directed by the trial court by its former judgment—but limited, in any event, to the amount of the money of W. S. Hinton shown to have been put into it, to-wit the sum of $5270 plus legal interest from the date of commencement of the action herein, this amount representing the purchase price of the cattle bought from Freeman and the loan of $1,000 in February, 1922.

The judgment of the lower court will accordingly be modified as above stated, and, as so modified, will be affirmed.

*Modified and Affirmed.*

POTTER, J., and KIMBALL, J., concur.